May I please the court. Terry Merriam for the appellants and I'd like to reserve four minutes for rebuttal. I won't go into the background of this case. This court is very familiar with the Hortquist partnerships, Walter J. Hortquist's criminal conviction and the complexity of his fraud. This particular case concerns whether or not Mr. and Mrs. Hansen were guilty of negligence in regards to this particular investment. This court has defined negligence as the lack of due care or the failure to do what a reasonable and prudent person would do under similar circumstances. And that is key to this case, under similar circumstances. It isn't, doesn't this case stand or fall on whether or not your clients had an obligation to consult with an independent conflict-solving advisor in the face of, what, eleven warnings from the Internal Revenue Service and express warnings from Mr. Hoyt that the IRS was looking at these tax shelters with a jaundiced eye? No. Why not? It doesn't, because the only actual warning from the Internal Revenue Service was a warning in regards to the 1980 spending and 1997 tax return refunds. And that warning said, we're not going to send you those refunds because we're going to look into this first. And if everything, and effectively, if everything's okay, we'll send you the refunds. The IRS then sent the refunds. The remainder of the notices are notices of examination, not a warning notice. But the tax court judge found as a matter of fact that they continued to receive notices after 1997, and that Mr. Hoyt continued to warn them that the IRS was still contesting the legitimacy of the deductions. So, don't we have to find that that factual finding is clearly erroneous in order to grant you the relief that you're seeking now? No. First of all, I think the factual finding as to the pre-1991, perhaps, yes. The warnings that occurred after the filing of the 1991 return, April 15th or in 1992 at some time, those would be after the fact. And so those wouldn't be, there wasn't a warning from the IRS in front of petitioners in this case. However, we do believe that those warnings... There were warnings before they filed the 1991 return in 1992, correct? Not specifically. There were, it's called a notice of beginning of administrative proceeding. It's the IRS says, I'm going to audit this partnership. That's it. Never good news when the Internal Revenue Service tells you that we're going to shine the searchlight on your tax return. Never good news. But this was also, 1991 was also after the Bales case, which was the same organization. Of course, there were similar warnings, if those are warnings in that case, I'm going to audit these partnerships. And the IRS lost. So in 1991, a notice... But lost on what issues, though? I read the Bales opinion, and it seems to me, and the tax court just, I guess, found that the Bales opinion dealt with different issues, different partnerships, different tax years. So the question is, I guess, whether or not it was reasonable for your clients to simply rely on Mr. Hoyt's reading of Bales and their own opinion and not seek the advice of an independent conflict-free tax advisor to see whether or not they had a problem. It wasn't reasonable to rely on the tax court finding that very similar partnerships by the same organization were legitimate transactions. As I read Bales, the issue really there had to do with the valuation of the bulls, did it not? Cattle, Your Honor. And these were actually, they valued the cattle in 85 and 86. And those are cattle, right? I'm not, bulls are cattle, right? Bales, I believe, well, yes, they are, but I believe it was the heifers. Okay, so now we're settled on that. But that seems to me, the valuation issue seems to me to be quite different from whether or not it was reasonable to think that these tax shelter schemes had been upheld. No, the IRS definitely asserted that these were shams. They disallowed everything, not just the value. The value was just one issue. And in fact, the court in Bales said something, the tax court said, well, these at first blush look like a tax shelter. It's not. There is a well-established cattle breeder here, and there are cattle. And then went in to the valuation. So no, that wasn't the only issue. Well, there's nothing illegal about a tax shelter per se, right? Absolutely. I mean, there are legitimate tax shelters and there are illegitimate ones. And the question is whether or not your clients as taxpayers were put on notice that the service considered this to be an illegitimate tax shelter. And no, not before the filing of the 1992 return. Pardon me. Didn't they get a warning from Hoyt when he talks about this as being a thousand-pound tax deduction package, and that they were probably going to get into tax litigation and should see their own tax man? And that was in 1986, three years before Bales was even decided. As Your Honor knows, you know, anyone who writes a tax opinion is always going to put in a warning about penalties. And how do they do that besides the CYA for themselves, right? Because you never know exactly what the IRS is going to do. But after the Bales decision came out, this looked legitimate, both the facts and the law. The problem in this particular case, by the way, was not the tax benefits. It was the mistake of fact due to Hoyt's fraud. Hoyt covered up the relevant facts. These taxpayers couldn't have discovered it. This Court removed her city manager. Well, but the relevant fact that you're talking about is the fact that there weren't enough cattle. Absolutely. Yeah, right. Basically, this was a Ponzi scheme or a pyramid scheme, whatever you want to call it. Bottom line is the money keeps going in, but the cattle keep disappearing. And the question is, without an actual audit of however many cattle there were, your clients couldn't know which cattle belonged to them. A point... But that's a different question from the one that Judge Bay and I are pursuing, which is in the face of all this, wouldn't a reasonable and prudent person have said, you know what, I better go see somebody who's a tax lawyer or a tax accountant who's not affiliated with Mr. Hoyt and ask that person what they think? An average, unsophisticated taxpayer would not, after the bail's decision. If I may reserve the remainder of my time for rebuttal. Thank you. Thank you. May I please have the Court? I'm Anthony Sheehan. I represent the Commissioner of Internal Revenue. Mr. Sheehan. Yes, sir. Is it true that the Commissioner determined that there was negligence and that shifted the burden of proof in the tax court to the taxpayer to disprove negligence? That is correct. At the time, this happened. And the Commissioner did that in his office without calling in Hanson, without asking any questions of Hanson, without any hearing, without any witnesses, just by sitting there and reading the file and deciding, I'm going to find her to be negligent. Does that really comport with due process? Well, the taxpayers get due process in that they can go to the tax court and present their case. They have to go there with the burden of proof approving a negative. I was not negligent. Everywhere else, when you sue somebody for negligence, the duty of proving negligence, the burden of proof, is on the plaintiff, not on the Commissioner. The Commissioner here decides in the closeted confines, friendly confines of his own office, this woman's negligent. That's just the burden of proof. I said so. Boom. Now she goes to the tax court and she has to be, she has the uphill duty of proving she's not negligent. Does that comport with your concept of reason, justice, and due process? Yes, it does, Your Honor, because that's, first of all, it's how the negligence penalty has always been done, and … It's not done any longer. Congress has not changed it. Well, right now, the government has the burden of production. But once we meet our burden of production, the burden of proof shifts back to the taxpayer. Well, but the burden of proof now is no longer on the taxpayer as to the burden of production, right? Right. The IRS has to put on some evidence to back up its finding. Once it does that, the burden of ultimate burden of proof … Well, it was in the hearing, right? Excuse me? Before that, before the present rule, the Commissioner did it in his office. They closed the door without telling his hands what was going on. Sometimes it happened after audit, but in a case like this, we've got hundreds of partners. That's about the only way to do it without calling people in. But in too many cases and due process, it's too scarce to pass it on, right? Plus, in this case, all they had to prove was that they exercised the reasonable care that an ordinary, prudent person would exercise in the face of all this evidence. It was not a very heavy burden for them to meet. Yet in this case, there were warnings all over the place, starting with the thousand-pound tax shelter, which had very graphic warnings by Hoyt himself that these things could possibly be audited, that they would be challenged, that the IRS would brand them as an abuse. Now, the Hansons might argue that, well, everybody gives warnings. And they also quote in one of their briefs Mrs. Hanson's statement, well, it's like going into surgery. They always tell you you might die. Well, in this case, it was almost like a doctor saying the ABA might brand me a quack, but trust me, I know what I'm doing. But she did. I mean, she went out. She visited the farms. She saw that there were, in fact, cattle grazing in the pasture. I guess Ms. Merriman makes the point that without doing an actual head count, you know, it took the service years to unravel Mr. Hoyt's fraudulent scheme here. Which gets us back to the point of nobody's asking the individual partners to go out and count thousands of cattle. But there were things in the offering materials, in the bails case, throughout this entire scheme that had the Hansons gone to competent, independent counsel, not the promoter like Hoyt, who was getting 75 percent of the tax savings. And they may argue he was an enrolled agent, and that's something special. But the law is clear. You cannot trust a promoter. For example, Hoyt claimed in the 1,000-pound tax shelter that after the tax year is over, I can rearrange all the tax items to get you the deductions you need to wipe out your tax liability. Now, you can't do that. As a matter of law, you can't do that. In bails, the partners in bails conceded that they could not do that. Plus, the partners in bails, right in the opinion, conceded that they could not take Hoyt deductions in excess of what they paid in. Mr. Sheehan, what do we do with the line, the opening line in bails, in which the tax court judge says the 26 dockets which were tried are test cases for petitioners in similar partnerships? Why wouldn't it be reasonable for Ms. Hanson to read that and say to herself, aha, this is the case in which the tax court is going to tell us whether or not these partnerships are legitimate? The problem with that is that on the one hand, Hansons are claiming they're completely unsophisticated and should get a break for that reason. Then they're claiming that they read bails and came to an independent understanding, despite their lack of sophistication, that this fact, everything was all right. As the tax court found, they really relied on Hoyt's interpretation. They can't claim they're unsophisticated and claim they read this lengthy, complex opinion and say, I understand it. It's clear to me. But we've got judges on the Sixth and the Tenth Circuits who don't necessarily agree on the way that the tax court judge read the sufficiency of bails to assuage a reasonable taxpayer's concern. We do have that, but both the Sixth and Tenth Circuits still upheld the negligence penalty based on the same partnership, same years represented with here. Another thing in bails was, again, the partners admitted they could not take deductions in excess of their cash contributions. Well, in this case, a competent tax professional, had the Hansons bothered to consult one, would have noticed that they had taken $310,177 of tax deductions based on a contribution of that time of only $50,000. Indeed, their tax reductions were $64,000 on a payment into Hoyt by that time of only $50,000. So that gets you into the regulation that says if it looks like it's too good to be true, then you now have an obligation to do what a reasonable, prudent person would do to ascertain whether or not it's a legitimate tax write-off, right? Right. And there are plenty of things here beyond sending a bunch of attorneys and accountants out to count cows that would show that by the time they took this deduction in 1991, there were problems. Another factor would be the material participation rules. There was several letters going back and forth where the IRS even quoted the regulation saying investor activities don't count as material participation. See your independent professional about it if you're confused. Was there anything that Ms. Hansen did that would be considered material participation by the commission? She claims that she contacted other people to try to sell partnership interests. That probably would count. But certainly reading and thinking about the materials, or as Mrs. Hansen said at the trial, any time I spend thinking about the partnerships, that wouldn't. And that's counted in the 114 hours. So we don't even know at this point whether she met material participation. She didn't work on any of the ranches. She didn't feed any of the cattle. She went on ranch visits in 90 and 93. There's no evidence she went in 91. Plus, we don't know exactly what they did in 90 and 93, whether they did any work or whether it was just come out and see it. How did they find out about these branches, the scheme? I believe Mr. Hansen learned about it from somebody at work. And, in fact, that would tie into one of the regulations, one of the examples in the regulations, which says, you know, you meet someone at work or meet a friend or somebody who's not a tax expert who says for a small amount of payment you can get a huge tax break. Look, I'm getting refunds. All my friends in this thing are getting refunds. You should do it, too. That kind of thing would not be a defense to the negligence penalty. Any further questions? Any further questions? Thank you. Thank you. The first point I'd like to address was the statements about an independent tax professional. And I would note that there's nothing in the record about what an independent tax professional would do if we're not talking about the tax court, with exception of how long perhaps it took the criminal investigator in Hoyt's criminal case, the Postal Inspector, how long to develop that case. I would note if we are going to go outside of the record, there is evidence in the RCR1 case that individuals did contact independent tax professionals, and they were told it was fine. So we simply can't, if we're going to go outside of this record, we should note that particular fact. The only thing we know is that the only professionals that she relied on were in the, to the extent that there was any reliance at all, was people who were in Mr. Hoyt's employ, correct? She relied on Mr. Kemp, who was a, yes, indeed, another Hoyt partner, but they relied on Mr. Kemp on the facts. And we indeed have seen the cattle. We have indeed received refunds. We have not had any problems to date. No, no, no, no. I think my question was there was reference, I think, in some of the Hoyt promotional materials to attorneys, tax attorneys that Hoyt had consulted. Yes. There were independent professionals that were paid, that have ethical standards, who won the Bales case. We don't know that, do we? Because we don't know who he talked to. Or must we presume that simply because the name? All of the names are in the record, Your Honor. It's Mr. Dismukes, Mr. McDonald, Mr. Cullen. They're all in the record, Your Honor. So, yes, we do know. He specifically mentions the name. But does Ms. Hansen know that? Yes. That's the question. Yes, Your Honor. So it's important not, it's important not to confuse or to bring that point into the record, since that's not a fact in this record about what exactly independent tax professionals would have advised. I would note that in RCR1, this Court stated, which is found at 401F3-1136-142, it was not a simple matter than to prove that some of the livestock that appeared as figures on the business paper said no corporeal substance on the ground. What is reasonable cause if not this set of facts? This was not on its face too good to be true. The tax benefits were appropriate. It was the facts that were the problem. Tax attorney would have gotten them to the facts. That's why in RCR1, there were the independent counsels that said, go ahead and do this. Ms. Merriman, why should we create a circuit split between the Tenth and the Sixth Circuits that have already decided on identical facts involving, in Mortenson in particular, the same tax shelter that the government wins? First of all, Mortenson is not yet final. We're still looking into that case. Secondly, Mortenson did not have the 1987 refund letter from the IRS and then get the refunds from the IRS, so some substantive action by the IRS that made this look appropriate prior to the filing of the 91- But the real issue for me, and maybe I'm missing something here, is the failure to go out and find an independent advisor. And on Mortenson, it seems that case is on all fours against you. You're talking about an independent tax advisor who would not be able to figure out that the cattle on the ground did not, in fact, exist. It's definitely a red herring. It's more than that, though, isn't it? In Van Scotten and in Mortenson, I can't remember which of those two cases, the court actually listed about a half a dozen things that a competent independent advisor would have cautioned the taxpayer. And every one of those items, all of those items except two, were actually in the Bales case. So it's irrelevant. One of the items was actually a mistake by the Sixth Circuit, and this Court is much more familiar with record. And that mistake is when the Sixth Circuit said there were no records, absence of records. The mistake there was the IRS's claiming that Mr. Mortenson didn't have the records. And the Sixth Circuit believed that that meant they didn't exist, as this Court knows. And as is in this record, there were millions, well, not in this record, thank goodness, of records associated with the White Cattle Partnership. It was a big operation. It was a big operation, yes. Yes. Big plot, too. Okay. You have extra time. Thank you. Okay. The case is argued as submitted for discussion.
judges: Schroeder, Tallman, Bea